JUDGE PAULEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 5856

BLACKBOOK CAPITAL LLC, APEX HOMES, INC., FRANKLIN OGELE, and LEONARD RAY WATTS,

CASE NO. _____

Plaintiffs,

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

-against-

ETICO CAPITAL L.P., JMBEE LLC, GLOBAL ASSET MANAGEMENT LLC, AEF LLC, and PTERODACTYL HOLDINGS LLC,

Defendants.

RECEIVED
AUG 20 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs, BLACKBOOK CAPITAL LLC ("BlackBook"), APEX HOMES, INC. ("Apex"), FRANKLIN OGELE ("Ogele"), and LEONARD RAY WATTS ("Watts") (collectively, BlackBook, Apex, Ogele and Watts are referred to as "Plaintiffs"), by their undersigned counsel, as and for their complaint against defendants, ETICO CAPITAL L.P. ("Etico"), JMBEE LLC ("JMBEE"), GLOBAL ASSET MANAGEMENT LLC ("Global"), AEF LLC ("AEF"), and PTERODACTYL HOLDINGS LLC ("Pterodactyl") (collectively, Etico, JMBEE, Global, AEF, and Pterodactyl are referred to as "Defendants"), allege as follows:

### NATURE OF THE ACTION

1. This action seeks an award of money damages against Defendants for tortious interference, fraudulent misrepresentation and negligent misrepresentation.

### PARTIES

2. Plaintiff BlackBook Capital LLC is a Delaware limited liability company with its principal place of business located at 420 Lexington Avenue, New York, NY. The only

1

members of BlackBook are Apex and Ogele.

3. Plaintiff Apex Homes, Inc. is a North Carolina corporation with its principal place of business located at 21333 Catawba Ave, Cornelius, NC. Apex is a member of BlackBook Capital LLC.

4. Plaintiff Franklin Ogele is a member and the President, Director of Financial Operations, and Chief Compliance Officer of BlackBook Capital LLC. Ogele is a resident of the State of New Jersey.

5. Plaintiff Leonard Ray Watts is the President of Apex Homes, Inc. and a resident of North Carolina.

6. Upon information and belief, defendant Etico Capital L.P. is a Delaware limited partnership with its principal place of business located at 405 Lexington Avenue, 7th Floor, New York, NY. Upon information and belief, Robert Fallah is the Co-Chairman of Etico Capital L.P. and a resident of New York.

7. Upon information and belief, defendant JMBEE LLC is a New York limited liability that has its address at 405 Lexington Avenue, 7th Floor, New York, NY 10174. Upon information and belief, Jeffrey Berman, is a member of JMBEE and a resident of New York.

8. Upon information and belief, defendant Global Asset Management LLC is a Delaware limited liability company and has an address at 405 Lexington Avenue, 7th Floor, New York, NY 10174. Upon information and belief, Robert Fallah is a member of Global and a resident of New York.

9. Upon information and belief, defendant AEF LLC is a Delaware limited liability company that has an address at 405 Lexington Avenue, 7th Floor, New York, NY.

Upon information and belief, Adam Friedman is a member of AEF and a resident of New York.

10. Upon information and belief, defendant Pterodactyl Holdings LLC is a Delaware limited liability company that has an address at 405 Lexington Avenue, 7th Floor, New York, NY. Upon information and belief, Scott Weisman is a member of Pterodactyl and a resident of New York.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because, upon information and belief, the parties are of diverse citizenship and the amount of controversy exceeds $75,000.00 exclusive of interest.

12. Personal jurisdiction over Defendants in this District is proper here pursuant to New York CPLR §§ 301 and 302(a).

13. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3).

## FACTUAL BACKGROUND

14. BlackBook was formed in or around November 2009. Since then, BlackBook has grown to become a full service broker dealer and financial institution that provides institutional, brokerage, private wealth management, and investment banking services.

15. In or around early 2010, Watts and Ogele commenced discussions regarding the development of a mortgage origination business at BlackBook, with a focus on the origination of mortgages for sale on the secondary market.

16. Pursuant to SEC Rule 15c3-1, operating such a business at BlackBook required an increase in its minimum net capital requirement from $5,000.00 to $100,000.00.

17. Ogele and Watts agreed to a transaction whereby Apex would invest

3

$100,000.00 of capital in BlackBook in exchange for a 4.75% interest in BlackBook. In addition, Apex entered into a lease for office space at 420 Lexington Avenue, New York, New York, which is currently occupied by BlackBook. Profits from the mortgage business would be distributed equally between Ogele and Apex as members of BlackBook.

18. In or around November 5, 2010, Ogele and Apex executed a member subscription agreement consistent with the terms of their agreement. In connection with the transaction, BlackBook submitted to the Financial Industry Regulatory Authority, Inc. ("FINRA") an application for business modification, seeking the necessary regulatory approvals to commence the mortgage business as contemplated by Ogele and Watts.

19. On or about May 11, 2011, FINRA granted BlackBook's application for business modification. After the application was approved, BlackBook began building its mortgage origination business as contemplated by the agreement between Ogele and Watts.

20. BlackBooks' ability to provide a wide range of services to its clients, including its mortgage origination services and the underwriting and syndication of new offerings, makes BlackBook an attractive target for other financial institutions interested in merging with or acquiring a broker-dealer firm.

**Defendants Make Fraudulent Statements and Misrepresentations
to Induce Plaintiffs to Sell a Membership Interest in Blackbook**

21. Beginning in or around April 2012, representatives of Etico and BlackBook commenced discussions regarding the possibility of acquiring a controlling interest in BlackBook. During these discussions, Defendants learned of the various services provided by BlackBook to its clients, including the mortgage origination business, and the licenses held by BlackBook.

22. In order to induce Ogele to sign the Proposed Purchase Agreement, Robert

4

Fallah, Co-Chairman of Etico, represented to Ogele that he intended to build BlackBook's investment bank business by, among other things, bringing Allan Harter to BlackBook. Mr. Fallah represented to Ogele that Allan Harter was formerly a prominent portfolio manager with Morgan Stanley Smith Barney and would bring assets in excess of $2,000,000,000.00 to BlackBook. Mr. Fallah discussed with Ogele the possibility of presenting business opportunities to Mr. Harter as part of Mr. Fallah's plans for BlackBook.

23. As further inducement, Mr. Fallah represented to Ogele that consummation of the transaction would result in the addition of many brokers to BlackBook. Mr. Fallah represented to Ogele that "we [Defendants] control Olympus Securities…., we need to acquire BlackBook because we have no more space at Olympus Securities to put our brokers."[1]

24. As further inducement, Scott Weisman, chairman of Pterodactyl, represented to Ogele that he held control over Josephthal & Co. Inc, implying that he was well-connected in the industry.

25. As further inducement, Defendants represented to Ogele that the post-acquisition BlackBook would enter into an employment agreement with Ogele whereby he would continue to serve as the Chief Compliance Officer and President of BlackBook.

26. Unbeknownst to Plaintiffs, the above statements and representations by Defendants and their representatives were false, misleading, and deceitful because, among other things, Defendants failed to disclose that Allen Harter had no plans to move his business to BlackBook, Defendants had no intention of presenting business opportunities to Allen Harter

---

[1] Indeed, in reliance on Mr. Fallah's representations, BlackBook incurred fees and expenses when it registered certain brokers from Olympus Securities.

5

through BlackBook, Etico had no controlling interest over Olympus Securities, and Mr. Weisman never had control over Josephthal & Co., Inc.

27. Furthermore, Mr. Fallah failed to disclose that his license to act as a securities broker in the State of Connecticut had been revoked for violating state securities laws. Pursuant to the Sarbanes-Oxley Act of 2002, such a revocation makes Mr. Fallah a statutorily disqualified person in the State of Connecticut.

28. During this time, Ogele was diagnosed with cancer. In or around May, 2012, Ogele was hospitalized and underwent surgery for treatment of cancer. After Ogele was released from the hospital, he was instructed to stay off his feet for approximately three weeks.

29. From approximately May, 2012 through June, 2012, the period of time Ogele was being treated for cancer and recovering from such treatment, representatives of the Defendants learned that Ogele had been diagnosed with and was receiving treatment for cancer. Representatives of the Defendants not only continued to contact Ogele, they increased their efforts to consummate an acquisition of an interest in BlackBook as quickly as possible.

30. In or around June, 2012, Etico proposed terms and conditions on which Etico or related parties would be willing to enter into a transaction to acquire an interest in BlackBook. Under Etico's proposal, Etico or related entities would acquire a 24.9% interest in BlackBook in an "initial closing" and, at Etico's option, acquire a further 51.1% interest in BlackBook in a "second closing." Etico's proposal was memorialized in an undated "Memorandum of Understanding" (the "Memorandum of Understanding").

31. The Memorandum of Understanding provides only that "[t]he parties *intend* to" enter into an agreement in the future (emphasis added.)

32. Relying on the representations and statements made by Defendants and

their agents, principals, and representatives, and while he was still recuperating from surgery, Ogele signed the Memorandum of Understanding on behalf of BlackBook on or about June 13, 2012.

### The Parties Never Executed the Proposed Purchase Agreement

33. In or around July 2012, the Defendants provided to Ogele a proposed purchase agreement that embodied the terms and conditions on which Defendants proposed to purchase from Ogele and Watts (collectively, the "Sellers") a 76% interest in BlackBook (the "Proposed Purchase Agreement").

34. Section 3.2 of the Proposed Purchase Agreement, among other things, provides:

> This agreement, *when executed and delivered by all parties hereto*, constitutes a legal valid and binding agreement of Seller enforceable against Seller in accordance with its terms.

(emphasis added.)

35. In or around August 2012, Ogele independently learned of an opportunity to participate in a loan facility for the construction of a hotel. Ogele contacted Mr. Fallah to express interest in presenting the opportunity to Mr. Harter. Mr. Fallah objected to Ogele's participation in the presentation of any opportunity to Mr. Harter. Mr. Fallah stated that any relationship with Mr. Harter belonged exclusively to Mr. Fallah. Mr. Fallah refused to allow the opportunity to be presented to Mr. Harter.

36. Thereafter, the parties organized a meeting with Watts to discuss the Proposed Purchase Agreement. Watts asked Defendants questions regarding distributions after consummation of the contemplated transaction with BlackBook. Defendants refused to provide details regarding how distributions would be made if the transaction was completed.

37. Watts rejected the terms offered by Defendants and declined to execute the Proposed Purchase Agreement.

38. Accordingly, the Defendants and Sellers failed to reach a meeting of the minds regarding the sale to Defendants of any interest in BlackBook. The Defendants and Plaintiffs failed to consummate any enforceable agreement regarding the sale and purchase of an interest in BlackBook.

39. Despite the lack of any enforceable agreement for the acquisition of an interest in BlackBook, Mr. Fallah made statements to third-parties claiming that he had taken control of BlackBook.

**<u>Defendants Improperly Commence Arbitration
Proceedings Against Plaintiffs</u>**

40. By filing a Statement of Claim ("SOC") with FINRA on March 19, 2013, Defendants commenced an arbitration against Plaintiffs captioned as *Etico Capital L.P. et al. v. BlackBook Capital LLC, et al.*, FINRA Dispute Resolution Case #13-00841 (the FINRA Arbitration").

41. In the SOC, Defendants alleged causes of action for breach of contract, promissory estoppel and detrimental reliance, and breach of the implied covenant of good faith and fair dealing. Buyer Defendants sought various unspecified damages. Upon information and belief, Defendants claimed damages in excess of $75,000.00.

42. There exists no agreement between any of the Plaintiffs and any of the Defendants that would require arbitration of the dispute at issue in the FINRA Arbitration.

43. No dispute arising from the matters at issue in the FINRA Arbitration are subject to mandatory arbitration pursuant to any FINRA Rule.

44. On May 14, 2013, Plaintiffs filed an order to show cause and application

for a temporary restraining order in the Supreme Court of the State of New York seeking an order staying the FINRA Arbitration. Plaintiffs' requested a stay on the grounds that Defendants failed to allege or otherwise establish (i) the existence of any agreement to arbitrate, or (ii) any facts showing that arbitration was required under the applicable FINRA rules.

45. On May 14, 2013, the state court granted Plaintiffs' application for a temporary restraining order, thereby staying the FINRA Arbitration. On June 17, 2013, Defendants, through their counsel, executed a stipulation, agreeing to, among other things, consent to a permanent stay of the FINRA Arbitration, withdraw their SOC, and take all steps necessary to terminate the FINRA Arbitration at no cost to Plaintiffs.

46. On June 25, 2013, Defendants wrote to FINRA requesting that their SOC be withdrawn, the FINRA Arbitration terminated and all costs and expenses to be allocated to Defendants. On July 2, 2013, FINRA notified counsel that the FINRA Arbitration had been removed from the arbitration docket. On July 8, 2013, the state court issued an order ruling that the proceeding to enjoin the FINRA Arbitration had been resolved pursuant to stipulation of the parties.

47. On July 25, 2013, BlackBook received notice that FINRA was assessing $1,500.00 in member fees against BlackBook in connection with the FINRA Arbitration. Pursuant to the parties' June 17, 2013 stipulation in the state court action, BlackBook requested that Defendants compensate it for the fees assessed against it in connection with the FINRA Arbitration. As of the date of this complaint, Defendants have failed to compensate BlackBook for fees assessed against it in connection with the FINRA Arbitration.

**Defendants' Fraudulent and Improper Actions Caused Blackbook To Suffer Damages**

48. As a result of Defendants fraudulent and deceitful conduct, Plaintiffs have

suffered damages, including but not limited to the loss of mortgage origination business opportunities.

49. Specifically, as a result of uncertainty arising from the claims Defendants' had asserted against BlackBook, Plaintiffs lost two mortgage origination opportunities with total face value of $1,150,000.00.

50. Plaintiffs have also lost other business opportunities and incurred unnecessary expenses, fees, and other damages as a result of Defendants conduct, including but not limited counsel fees and expenses related to improper commencement of the FINRA Arbitration.

### FIRST CAUSE OF ACTION
(Tortious Interference)

51. Plaintiffs repeat, reiterate and re-allege each and every allegation contained in paragraphs "1" through "50", inclusive, with the same force and effect as though set forth more fully herein at length.

52. Plaintiffs had contracts relating to or the reasonable expectation of economic advantage in connection with their ongoing mortgage origination business at BlackBook.

53. Defendants intentionally and maliciously interfered with Plaintiffs' reasonable expectation of economic advantage.

54. Defendants' interference caused the loss of the prospective gains expected by Plaintiffs.

55. As a result of Defendants' tortious interference, Plaintiffs have suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Fraud and Fraudulent Inducement)

56.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in paragraphs "1" through "55", inclusive, with the same force and effect as though set forth more fully herein at length.

57.     Defendants made representations of fact that were false or omitted information necessary to make their statements and representations not misleading.

58.     Defendants knew their representations were false or omitted information necessary to make the representations not misleading, and Defendants intended Plaintiffs to rely on such representations.

59.     Plaintiffs reasonably relied on Defendants representations.

60.     As a result of Plaintiffs reliance on Defendants' representations, Plaintiffs suffered damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Negligent Misrepresentation)

61.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in paragraphs "1" through "60", inclusive, with the same force and effect as though set forth more fully herein at length.

62.     Defendants owed a duty of disclosure to Plaintiffs.

63.     Defendants negligently provided false information and/or negligently failed to disclose information to Plaintiffs.

64.     Plaintiffs were reasonably foreseeable recipients of the false information.

65.     Plaintiffs justifiably relied on the false information provided by Defendants.

66. The false information provided by Defendants proximately caused damage to Plaintiffs in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants and in favor of Plaintiffs as follows:

(a) On the First Cause of Action, an award to Plaintiffs and against Defendants, jointly and severally, of actual and punitive damages in an amount to be determined at trial;

(b) On the Second Cause of Action, an award to Plaintiffs and against Defendants, jointly and severally, of actual and punitive damages in an amount to be determined at trial;

(c) On the Third Cause of Action, an award to Plaintiffs and against Defendants, jointly and severally, of actual and punitive damages in an amount to be determined at trial;

(d) As to all Causes of Action, an award in favor of Plaintiffs for pre-judgment interest, costs and expenses; and

(e) awarding such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all claims so triable.

Dated: New York, New York
       August 20, 2013

Respectfully submitted,

MICHAEL JAMES MALONEY, PLLC

By: _____
    Michael James Maloney
39 Broadway – Suite 1540
New York, New York 10006
Tel. (646) 564-3510
Fax. (212) 203-6445
michael@michaeljamesmaloney.com

*Attorneys for Plaintiffs BlackBook Capital, LLC, Apex Homes, Inc., and Leonard Ray Watts*

## **VERIFICATION**

I, Franklin Ogele, Esq., declare under the penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that:

I am a member and President, Director of Financial Operations, and Chief Compliance Officer of BlackBook Capital LLC.

I have read the foregoing Verified Complaint and Demand for Jury Trial and know the contents thereof. The allegations contained in the Verified Complaint are true and correct, based on my personal knowledge, information or belief, or based upon information provided to me by others in the company whom I believe to be reliable sources of such information.

Executed on this 13th day of August, 2013

_____
Franklin Ogele